IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>CHATTERY INTERNATIONAL,<br>INC., <em>et al.</em>,</td><td>*</td><td></td></tr>
<tr><td>    Plaintiffs –<br>    Counter-Defendants,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>    v.</td><td>*</td><td>CIVIL NO.: WDQ-10-2236</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>JOLIDA, INC., <em>et al.</em>,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>    Defendant –<br>    Counter-Plaintiffs.</td><td>*</td><td></td></tr>
</table>

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Chattery International, Inc. ("Chattery") and Shanghai Shenda Sound Electronic Co., Ltd. ("Shenda") sued JoLida, Inc. ("JoLida") for unauthorized use and registration of a trademark, breach of contract, false designation of origin, and related claims. JoLida counterclaimed against Chattery, Shenda, Jing Guo Chen (collectively, the "Shenda Parties"), and Marc Prylli for trademark infringement, cybersquatting, tortious interference with economic relations, civil conspiracy, and related claims. For the following reasons, the Shenda Parties' motion to remand and JoLida's motion for preliminary injunction will be denied, and Prylli's motion to dismiss for lack of personal jurisdiction will be granted.

I.   Background[1]

In December 1983, cousins Michael Allen and Huang Hong-Sheng and others incorporated JoLida in Maryland.  Countercl. ¶ 9.[2]  Allen is its president and chief executive officer.  Allen Decl. ¶ 2.  JoLida primarily sold China-manufactured vacuum tubes used in electronics.  Countercl. ¶ 11.  In December 1986, JoLida began selling products using an "X Marks the Spot" design trademark in conjunction with a "JOLIDA" word trademark:



*Id.* ¶ 10.

In 1993, JoLida began designing amplifiers that use vacuum tubes ("tube amplifiers").  *Id.* ¶¶ 12–13.[3]  In 1994, JoLida began purchasing vacuum tubes manufactured by Shuguang Tube.  Allen Decl. ¶ 6.  In connection with that relationship, JoLida applied to the United States Patent and Trademark Office ("USPTO") in

---

[1] For the Shenda Parties' motion to remand for lack of subject matter jurisdiction, the well-pled allegations in its complaint are accepted as true.  *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).
    For Prylli's motion to dismiss for lack of personal juris-diction, all "disputed facts and reasonable inferences" are to be drawn in JoLida's favor.  *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

[2] "JoLida" combines the first names of the mothers of Hong-Sheng ("Jo" for "Joanne") and Allen ("Lida").  Countercl. ¶ 9.

[3] These amplifiers are marketed to audiophiles who believe that amplifiers that use vacuum tubes sound better than amplifiers that use transistors.  Countercl. ¶ 12.

1994 to register the trademark "S.G. JOLIDA."  *Id.*; Kamarei

Decl., Ex. 1.  However, JoLida decided not to use that trademark

and abandoned its application.  *Id.*; Allen Decl. ¶ 6.

In January 1995, Chattery was incorporated in Maryland.

Compl. ¶ 1; ECF No. 14 at 4.  Jing Guo Chen is its chairman and

chief executive officer.  *Id.*

Sometime in 1995, JoLida began manufacturing and distrib-

uting tube amplifiers and other audio equipment to United States

customers.  Countercl. ¶ 13.  Trade journals first described

JoLida's products as unreliable and poorly constructed.  *See,*

*e.g.*, *id.*, Ex. 1 at 2.

Sometime before or in 1996, JoLida began to outsource the

manufacture of its tube amplifiers and other products to makers

in China.  Countercl. ¶ 29.  In June 1996, JoLida received

defective amplifiers from a manufacturer.  *Id.* ¶ 31.  Sometime

in or after September 2006, JoLida's Hong-Sheng entered into a

contract with Chattery's Chen, his old classmate, under which

Chattery agreed to fix the amplifiers.  *Id.* ¶ 33.

In November 1996, Shenda was formed in China as JoLida's

subsidiary.  ECF No. 14 at 4.  Chen managed Shenda.  Countercl.

¶ 34.  In 1996 or 1997, JoLida began using Shenda as the suppli-

er and manufacturer of parts for JoLida's tube amplifiers.  *Id.*

The Shenda Parties assert that sometime before May 1997,

Chattery and JoLida entered into a joint venture agreement that

required them to invest $1 million in Shenda (the "Joint Venture
Agreement"), but JoLida did not contribute its capital share.
Chen Decl. ¶ 3.  JoLida asserts that there is no evidence of the
Joint Venture Agreement, but does not deny its existence.  *See*
ECF No. 23 at 10 n.20.

The Shenda Parties assert that because JoLida did not con-
tribute its share under the Joint Venture Agreement, Chattery
and JoLida entered into a new agreement on May 26, 1997 (the
"1997 Agreement").  Chen Decl. ¶ 4; ECF No. 48, Ex. A.[4]  The
alleged 1997 Agreement is typed in Chinese on JoLida's letter-
head and includes JoLida's telex number.  *Id.*  A translation of
the alleged 1997 Agreement provides, *inter alia*, that:

> [JoLida] agrees to transfer all shares of [Shenda] to
> [Chattery] for the transfer amount of $300,000 USD which is
> to be directly wired by [Chattery] to the company account
> of Shenda . . . in order to complete the investment as soon
> as possible.

> [Chattery] authorizes [JoLida] to be the sole distributor
> for the U[nited] S[tates] and Europe for the audio product
> series manufactured by Shenda.  Shenda shall distribute its
> products by itself in China and Asia.

> In order to improve the image of [JoLida] in the U[nited]
> S[tates], [Chattery] agrees to use the logo X originally
> used by [JoLida], and to use "JOLIDA" as the trademark as
> [*sic*] the audio products produced by Shenda.

> *The trademarks used by the audio products manufactured by
> Shenda belong to Shenda*, and shall be registered in China
> by Shenda.  Should [JoLida] wish to register the [subject]

---

[4] The Shenda Parties' unopposed motion to file a replacement
color copy of the 1997 Agreement, which attached the replacement
copy, will be granted.  *See* ECF No. 48.

trademark for the audio products in the U[nited] S[tates] and other countries and areas, *[JoLida] must obtain authorization from Shenda*.

The intellectual property rights of the audio products manufactured by Shenda belong to Shenda.  [JoLida] should not produce or ask others to produce identical products.

Compl., Ex. A at 2 ¶¶ 1-2, 4-6 (emphasis added).

In June 1997, JoLida's Hong-Sheng died unexpectedly.  ECF No. 20 at 8.  The Shenda Parties assert that Hong-Sheng had signed and mailed the 1997 Agreement to Chen, who countersigned on behalf of Chattery and returned a copy of the agreement to Hong-Sheng.  Chen Decl. ¶¶ 5-6.  Shenda has the original alleged 1997 Agreement.  *Id.* ¶ 5.  JoLida asserts that the 1997 Agreement is a fake.  ECF No. 14 at 12.[5]

Sometime in 1997, Shenda became Chattery's wholly-owned subsidiary and ceased to be JoLida's subsidiary.  Chen Decl. ¶ 8.

On March 28, 1998, Shenda registered the "JOLIDA" word trademark and the "X Marks the Spot" design trademark in China. *See* Compl., Ex. A; ECF No. 23 at 8.

From 1997 to 2008, Shenda manufactured audio products for JoLida.  ECF No. 14 at 5.  From 1997 to 2000, Shenda operated at a loss, and Chen continued to provide capital for the company. Chen Decl. ¶ 10.  Shenda hired engineers and technical staff to improve the quality of its products, and sales increased.  *Id.*

---

[5] JoLida's arguments against the authenticity of the 1997 Agreement will be discussed in Part II.B.2.a.

Shenda's factory manager was Qin Zhong ("Loyal Qin").[6]  *Id.*
¶ 12.  The Shenda Parties assert that Loyal Qin was "secretly
conspir[ing] with JoLida to build a competing factory," and that
he stole Shenda's intellectual property, including its manu-
facturing designs and configurations.  *Id.*

In 2003, Shenda made its first profit, and sales continued
to increase.  *Id.* ¶ 11.  Its audio products for JoLida received
positive reviews and won engineering awards.  *See, e.g.*,
Countercl., Ex. 1 at 4, 12.

On June 29, 2005, Loyal Qin--Shenda's factory manager--
signed a "Resolution [by Shenda's] Board of Directors" that
JoLida's trademarks belonged to JoLida in America and to Shenda
in China.  *See* Countercl., Ex. 10 at 2 [hereinafter Shenda Reso-
lution].  On July 18, 2005, Loyal Qin signed a "Declaration of
Responsibility" that "noted that the name of JoLida is an exclu-
sive trademark name owned by JoLida, Inc." *See* Countercl., Ex. 11.

On September 19 and 20, 2005, JoLida applied to register
the "X Marks the Spot" design trademark and the "JOLIDA" word
trademark (collectively, the "JoLida Trademark") with the USPTO.
Countercl. ¶¶ 18, 20; *id.*, Exs. 3, 5.  In 2006 and 2007, the
USPTO granted JoLida's applications.  *Id.*  Thus, JoLida is the
registrant of the JoLida Trademark.

---

[6] "Loyalqin" is the username for Qin Zhong's e-mail address.  ECF
No. 20 at 11 n.4

On March 16, 2006, Loyal Qin signed a document stating that JoLida owned certain legal records allowing it to sell audio equipment in Europe, and Shenda could not use or transfer those records. *See* Countercl., Ex. 12 [hereinafter Certificate Confirmation].

On January 10, 2007, JoLida opened a factory in China, JoLida Shanghai Co. Ltd. ("JoLida Shanghai"), and began to transfer the manufacturing process there from Shenda. ECF No. 14 at 5. Loyal Qin left Shenda to work for JoLida Shanghai. Chen Decl. ¶ 12. JoLida asserts that it created JoLida Shanghai to take control of its products because "the quality of Shenda's manufacturing began to deteriorate." ECF No. 14 at 5; Countercl. ¶ 36. The Shenda Parties assert that Shenda was cut out because profits were increasing, and Loyal Qin stole Shenda's designs and configurations to use at JoLida Shanghai. ECF No. 20 at 11; Chen Decl. ¶ 12.

On April 3, 2007, JoLida obtained international registration for the JoLida word trademark. *Id.*, Ex. 4.

In February 2008, JoLida stopped ordering from Shenda. *See* Countercl. ¶¶ 54-55.

On September 5, 2008, the Shenda Parties sued JoLida Shanghai in China, seeking to shut down the factory and/or enjoin JoLida from using the JoLida Trademark in violation of the 1997 Agreement. Countercl. ¶ 63; Answer to Countercl. ¶ 63.

JoLida asserts that the Chinese court "found in favor of JoLida Shanghai"; the Shenda Parties assert that the court found that JoLida "was not allowed to mark [its] goods with Shenda's JOLIDA mark." *Id.*; Countercl. ¶ 63.

JoLida's official website is "www.jolida.com."  The website markets JoLida's audio products--which bear the JoLida Trademark--and provides information about its company.  JoLida sells its products to distributors and retailers; it does not accept customer orders.  *See* Countercl. ¶ 15.

In late 2009, the "www.jolida.fr" website began operating. Jolida.fr is owned by Marc Prylli, Shenda's marketing and overseas manager, who is a citizen and resident of France.[7]  The website is in French and tells customers where to buy Shenda's audio products--all bearing the JoLida Trademark--from retailers in France. Jolida.fr also describes Shenda's history and dispute with JoLida.

On January 15, 2010, Prylli e-mailed JoLida's Allen in Maryland and stated that the "www.jolida.net" website would begin operating in less than a week unless JoLida sold its French trademark registration to the Shenda Parties "very quickly." ECF No. 37, Ex. 4 at 1.  Sometime after that e-mail, the

---

[7] *See* Prylli Decl. ¶ 1; Countercl., Ex. 14; Jolida.net, About Us, http://jolida.net/about_us.htm (last visited Mar. 15, 2011).

jolida.net website, which is also owned by Prylli, began operating.  Countercl., Ex. 17.

Customers can buy Shenda's audio products--all bearing the JoLida Trademark--directly from jolida.net.[8]  Before making a purchase, customers are directed to "Choose Your Country," and must select the United States, Canada, or another country.

The homepage of jolida.net states that the website "does not have connections with [the] Maryland Jolida[,] Inc.," and warns visitors about "counterfeit products from Maryland['s] jolida.com."  The website states that only jolida.net sells genuine JoLida audio equipment.  It also contains photos and a video tour of Shenda.[9]  Jolida.net describes its dispute with JoLida in detail, and accuses JoLida and Allen of dishonesty. The website includes a copy of the alleged 1997 Agreement.

Jolida.net also includes a "friendly official warning to existing JoLida[,] Inc. Resellers" that Shenda "owns the intel-lectual property of all the products [it] manufacture[s]" under the 1997 Agreement, and that JoLida "stole . . . all the propri-etary designs we had developed."  Jolida.net, The Resellers

---

[8] The Shenda Parties have also sold products on an Internet auction website and through resellers, usually for prices cheaper than JoLida's.  ECF No. 14 at 18; ECF No. 45 at 4.

[9] *See* YouTube, JoLida Shenda Factory Tour, http://www.youtube.com /watch?v=p2o2YlhKyeI (last visited Mar. 15, 2011).

Section, http://jolida.net/resellers.htm (last visited Mar. 15, 2011).  The website further explains:

> [W]e do not intend to take any legal action for selling fake Jolidas at this step, since we believe that all of you acted in good faith, and were merely misled and manipulated by Michael Allen.  We also understand you would like to wait for the result of our lawsuit against Mr. Allen. . . . Clearly our position has to be that if any reseller goes on to buy these counterfeit Jolida products from Jolida Inc, after reading the information and the evidence we have provided on our website, we can only assume that it know-ingly chooses to buy counterfeit equipment and will have a much smaller chance to continue as legitimate Jolida dealers when we will have established our new network.

*Id*.

On March 31, 2010, the Shenda Parties sued JoLida in the Circuit Court for Baltimore City for unauthorized use and registration of the JoLida Trademark in violation of the 1997 Agreement, breach of contract, false designation of origin under the Lanham Act, and related claims (the "Baltimore City Case").  ECF No. 36, Ex. 1.  On May 20, 2010, JoLida removed that case to this Court.  ECF No. 38, Ex. 1 ¶ 1.  However, JoLida discovered that it had filed its removal notice too late under 28 U.S.C. § 1446, and moved to remand.  *Id*. ¶¶ 2-4.  After the case was remanded to the Circuit Court for Baltimore City, JoLida and the Shenda Parties stipulated to a dismissal of the case for improp-er venue.  ECF No. 38 at 2.

On June 17, 2010, Prylli e-mailed Allen:

> If you are still considering selling [JoLida] . . . then [I] can have a visit [to] Annapolis[, Maryland in the] near future.

ECF No. 37, Ex. 4 at 4.

On June 21, 2010, the Shenda Parties filed a complaint against JoLida in the Circuit Court for Howard County (the "How-ard County Case") that was largely identical to the Baltimore City Case.  ECF No. 1 ¶ 1.

On June 30, 2010, Prylli e-mailed Allen:

> There is still a little time for you to find a[n] honorable ending by selling [JoLida] to Shenda. . . .  In 48 [hours,] Chen will buy a big building in Washington DC to make our new Jolida U[nited] S[tates] sales office. . . .  You have just 48 [hours] to decide. . . .  After this deadline, Chen, Shenda[,] and I will have only one goal in our lives, kill your company by fair competition and replace you in the U[nited] S[tates] market.

Countercl., Ex. 21 at 1–2.

On July 1, 2010, Prylli e-mailed one of JoLida's distribu-tors, stating that Shenda owned the JoLida Trademark, JoLida made fake products, Allen was a liar, and jolida.net's descrip-tion of the dispute would allow the distributor to make his "own judgment [about] who is the real JoLida."  Countercl., Ex. 19.

On August 10, 2010, Prylli e-mailed Allen, stating that Chen had been unable to buy the DC office and asking whether Allen would "mind if we [became] neighbo[rs] in Maryland."  ECF No. 37, Ex. 4 at 13.

On August 13, 2010, JoLida removed the Howard County Case to this Court.  ECF No. 1.

On August 18, 2010, Prylli learned that one of JoLida's
distributors, Underwood Hifi, had told someone[10] that: JoLida
owned the JoLida Trademark, Shenda sold counterfeit products,
and jolida.net would disappear after this lawsuit.  Countercl.,
Ex. 20 at 4.  That day, Allen e-mailed Underwood Hifi:

> [A] customer forward[ed] an email from you today where you
> LIE[D] to him. . . .  PLEASE [call me] to make clear if it
> was a misunderstanding ([a] situation that I truly and
> sincerely hope is the reality) or let me know if you are
> [Allen's] full ally . . . and in that case please know
> [that] we would sue you as well as him. . . .

*Id.* at 2.[11]

On August 20, 2010, JoLida counterclaimed against the
Shenda Parties and Prylli in this Court for trademark infringe-
ment, cybersquatting, tortious interference with economic
relations, civil conspiracy, and related claims.

On August 24, 2010, JoLida moved for a preliminary injunc-
tion.  ECF No. 14.[12]

On August 28, 2010, Prylli e-mailed Allen and stated that
he was "confident [enough] to make [a] list of 97% to 98% of

---

[10] JoLida alleges that this individual was Prylli posing as a
potential customer.  Countercl. ¶ 78.

[11] Sometime in August 2010, jolida.net posted that Underwood Hifi
was JoLida's supplier, not an authorized dealer for genuine
JoLida products manufactured by Shenda.  Gayfield Decl., Ex. 4.
This is no longer on jolida.net.

[12] JoLida's unopposed motion to file a surreply to its motion for
preliminary injunction, which attached the proposed surreply,
will be granted.  *See* ECF No. 45.

[JoLida's resellers] and contact them in [the] near future."
Allen Decl., Ex. 20.

On September 9, 2010, the Shenda Parties opposed JoLida's motion for preliminary injunction.  ECF No. 20.  On September 24, 2010, JoLida filed its reply.  ECF No. 23.

On October 29, 2010, Prylli moved to dismiss for lack of personal jurisdiction.  ECF No. 34.  That day, the Shenda Parties moved to remand.  ECF No. 36.  On November 15, 2010, JoLida opposed those motions.  ECF No. 37, 38.  On December 2, 2010, Prylli filed his reply to JoLida's opposition to his motion to dismiss.  ECF No. 39.

In December 2010, three customers who had bought audio products from the Shenda Parties contacted JoLida for customer support.  ECF No. 45 at 2-4.

On January 5, 2011, JoLida moved to file a surreply to its opposition to Prylli's motion to dismiss.  ECF No. 46.  On January 21, 2011, Prylli opposed that motion.  ECF No. 47.

II.  Analysis

   A. The Shenda Parties' Motion to Remand

   1. Standard of Review

A defendant may remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" unless expressly prohibited.  28 U.S.C. § 1441(a).  The district courts have original jurisdiction over

all civil actions arising under: the "Constitution, laws, or treaties of the United States," *id.* § 1331; "any Act of Congress relating to . . . trademarks," *id.* § 1338; and the Lanham Act,[13] 15 U.S.C. § 1121.

In determining whether an action "arises under" federal law, courts must look at the face of the complaint and consider, for example, whether the plaintiff's "right to relief depends upon the construction or application of federal law." *Verizon Md., Inc. v. Global NAPS, Inc.*, 377 F.3d 355, 362-64 (4th Cir. 2004) (*citing Smith v. Kan. City Title & Trust Co.*, 255 U.S. 180, 199 (1921)). Difficult or important state law questions do not defeat jurisdiction "when the complaint shows that the claim for relief arises under a cause of action created by federal law." *Arthur Young & Co. v. City of Richmond*, 895 F.2d 967, 971 (4th Cir. 1990). However, if a claim is supported by a theory establishing federal jurisdiction *and* an alternative theory that would not establish such jurisdiction, federal jurisdiction does not exist. *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 153 (4th Cir. 1994) (*citing Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 811 (1988)).

Supplemental jurisdiction exists over "all other claims that are so related to claims in the action within such original

---

[13] 15 U.S.C. §§ 1051 *et seq.*

jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).[14]  Claims are part of the same case or controversy if they stem from a "common nucleus of operative facts." *Rosmer v. Pfizer Inc.*, 263 F.3d 110, 116 (4th Cir. 2001) (*citing United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).  Generally, only a "loose factual connection between the claims" is required for claims to arise from a common nucleus of operative facts. *Posey v. Calvert Cnty. Bd. of Educ.*, 262 F. Supp. 2d 598, 600 (D. Md. 2003).

A defendant may only remove state court actions that "originally could have been filed in federal court." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  Because removal "raises significant federalism concerns," removal jurisdiction is strictly construed, and the case must be remanded if federal jurisdiction is doubtful. *Mulcahey*, 29 F.3d at 151.

2. Federal Question Jurisdiction over the Shenda Parties' Complaint

The Shenda Parties move to remand its complaint, which had been removed by JoLida to this Court, to the Circuit Court for Howard County for lack of subject matter jurisdiction.  ECF No. 36 at 1.  They argue that only Count III of their complaint

---

[14] A court may decline supplemental jurisdiction when (1) a claim raises a complex or novel state law issue, (2) the state claim substantially predominates, (3) all claims over which the court had original jurisdiction are dismissed, or (4) there are exceptional circumstances.  28 U.S.C. § 1367(c).

mentions federal law, and it does not present a federal ques-
tion.  *Id.* at 2.[15]

### a. Count III

The Shenda Parties' Count III, captioned "False Designation
of Origin and Unfair Competition[,] 15 U.S.C. § 1125(a),"[16]
alleges, *inter alia*: (1) Shenda is the "rightful owner" of the
JoLida Trademark that JoLida registered with the USPTO; (2)
JoLida's use of the JoLida Trademark in commerce tends to "false-
ly describe or represent" that JoLida and its products are "au-
thorized, sponsored, affiliated[,] or associated with Shenda";
(3) the JoLida Trademark on JoLida's products has created and
continues to create a "likelihood of confusion . . . as to the
origin, sponsorship, or approval of [JoLida's] audio products
among the public"; (4) JoLida's acts have been "deliberate,
willful[,] and wanton, making this an exceptional case within the
meaning of 15 U.S.C. § 1117[, the Lanham Act's damages provi-
sion]; and (5) Shenda is entitled to all "remedies available
under the Lanham Act," including a permanent injunction, treble
damages, and attorneys' fees.  Compl. ¶¶ 30–34, 37–38.

---

[15] Because JoLida and Chattery are Maryland corporations, there
is not complete diversity.

[16] The Shenda Parties' remaining claims are based on state law:
unauthorized use and registration of the JoLida Trademark in
violation of the 1997 Agreement; breach of contract; common law
unfair competition, trademark infringement, and unjust enrich-
ment; and conversion.  *See* Compl. 6–13.

b. False Designation of Origin Under the Lanham Act

Under Section 1125(a) of the Lanham Act, which prohibits the use of false designation of origin, a civil action may be brought against any person who

> in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, [that is] likely to cause confusion [or] mistake . . . as to the origin, sponsorship, or approval of his or her goods[.]

15 U.S.C. § 1125(a).

Because the Lanham Act does not confer jurisdiction "simply because the subject in dispute is a trademark," the complaint must allege a violation of the statute--not just a violation of ownership rights--to state a Lanham Act claim. *Gibraltar, P.R., Inc. v. Otoki Group, Inc.*, 104 F.3d 616, 619 (4th Cir. 1997).

c. Count III and the Lanham Act

The Shenda Parties argue that Count III merely alleges an ownership dispute governed by state contractual law, and is an "alternative theory" to the complaint's state law claims.   ECF No. 36 at 3.  They contend that the "gravamen" of Count III is that Shenda owns the JoLida Trademark, so that JoLida's use of that trademark is a false designation of origin.  *Id.* at 18. The Shenda Parties also argue that JoLida waived its right to remove.  *Id.* at 27.

JoLida asserts that this Court has original jurisdiction over Count III and supplemental jurisdiction over the remaining claims, and that it never waived its right to remove.  ECF No. 38 at 3-14.

Count III arises under § 1125(a) of the Lanham Act.  The Shenda Parties' complaint alleges that Shenda owns the JoLida Trademark *and* that JoLida is creating confusion about the origin of its products by falsely representing them as sponsored or approved by Shenda.  Compl. ¶¶ 30-34; *see Caterpillar*, 482 U.S. at 392.  To resolve Count III, the Court must interpret and apply § 1125(a), which prohibits any person from making false representations likely to confuse the public as to the "origin, sponsorship, or approval of his or her goods[.]"  15 U.S.C. § 1125(a).  Thus, the Shenda Parties have "allege[d] more than [a] violation of ownership rights" in the JoLida Trademark.[17] Further, the Shenda Parties seek all "remedies available under the Lanham Act," including a permanent injunction, treble

---

[17] *JTH Tax, Inc. v. Vacchiano*, No. 2:06CV418, 2006 WL 3299996, at *3 (E.D. Va. Oct. 25, 2006) (plaintiff stated a Lanham Act claim by alleging that it owned trademarks and that the defendant's use of those or confusingly similar trademarks constituted infringement); *Silverstar Enters, Inc. v. Aday*, 537 F. Supp. 236, 241-42 (S.D.N.Y. 1982) (Section 1125(a) claim failed because the plaintiff alleged only the breach of a trademark license agreement, not that confusion about the product's source would result).

damages, and attorneys' fees.  Compl. ¶¶ 37–38.[18]  That Count

III involves the interrelated issue of trademark ownership under

the 1997 Agreement does not defeat federal jurisdiction.[19]

> d. Count III Was Not Pled in the Alternative

The Shenda Parties' assertion that Count III is merely an

"alternative theory" to its state law claims does not render the

interpretation of federal law unnecessary or deprive the Court

of federal question jurisdiction.  ECF No. 36 at 3, 22; *see*

*Mulcahey*, 29 F.3d at 153.  As JoLida notes, the complaint does

not indicate that Count III was alleged in the alternative to

the state law claims.  Rather, Count III alleges that JoLida's

"deliberate[ly] willful and wanton [acts make] this an excep-

tional case" under the Lanham Act's damages provision, justifying

relief unique to that statute.  Compl. ¶¶ 37–38 (*citing* 15

U.S.C. § 1117).  Because the Court must interpret the Lanham Act

in deciding whether to award such relief, the interpretation of

---

[18] *Cf. Arthur Young*, 895 F.2d at 971 (claim arose under the
federal Copyright Act because plaintiff alleged federal copy-
right infringement and sought remedies "expressly granted" under
the statute).

[19] *See, e.g., N. Am. Van Lines, Inc. v. Atl. Transfer & Storage
Co.*, 487 F. Supp. 2d 672, 674 (D.S.C. 2007) (federal juris-
diction existed over claims that the defendant had used trade-
marks "in a manner unauthorized by the [parties' contract]" and
violated the Lanham Act); *see also Arthur Young*, 895 F.2d at
971.

that federal statute is essential to Count III.[20]   The Shenda

Parties' "alternative theory" argument fails.

        e. Waiver of JoLida's Right to Remove

     The Shenda Parties also argue that JoLida waived its right

to remove this case from the Circuit Court for Howard County

when JoLida: removed the largely identical Baltimore City Case

to this Court, and then sought to remand that case to the

Circuit Court for Baltimore City.   ECF No. 36 at 27.

     A defendant may waive the right to remove by taking a "sub-

stantial defensive action in the state court before petitioning

for removal."   *Aqualon Co. v. Mac Equip., Inc.*, 149 F.3d 262,

264 (4th Cir. 1998).   Because waiver occurs only in "extreme

situations," the defensive action must demonstrate a "clear and

unequivocal intent to remain in state court."   *Id.*

     The Shenda Parties have not argued that JoLida took a

substantial defensive action in the Circuit Courts for Baltimore

City or Howard County before removing those cases here.   Further,

JoLida moved to remand the Baltimore City Case merely because

its removal notice was late.   ECF No. 38, Ex. 1 ¶¶ 2-4.   After

---

[20] *Compare Mulcahey*, 29 F.3d at 150, 153 (plaintiffs' reference
to federal, state, and local environmental statutes in its
negligence claim did not confer federal jurisdiction; even if
the defendant had not violated the federal statutes, plaintiffs
could still recover under state and local environmental laws),
*with* Compl. ¶¶ 29-38 (citing only the Lanham Act, describing its
false designation of origin standard, and seeking relief under
that statute).

stipulating to a dismissal of the Baltimore City Case for improper venue, the Shenda Parties filed a new complaint in the Circuit Court for Howard County, which JoLida removed (this case).  ECF No. 38 at 2; ECF No. 1 ¶¶ 1, 3.  This is not an "extreme situation" in which JoLida waived its removal rights.

> f. Supplemental Jurisdiction over the Shenda Parties'
> Remaining Claims

As explained above, the Court has jurisdiction over Count III, which alleges that Shenda owns the JoLida Trademark under the 1997 Agreement, and JoLida has falsely represented that its products are sponsored or approved by Shenda in violation of the Lanham Act.  *See supra* Part II.A.2.a-e.  The Shenda Parties' remaining claims contain allegations about JoLida's purported trademark violations and breach of the 1997 Agreement.  *See* Compl. ¶¶ 18-68.  These allegations are part of the common nucleus of operative facts underlying Count III; the Court may take supplemental jurisdiction over these claims.[21]

Because the Court has original jurisdiction over the Shenda Parties' federal Lanham Act claim (Count III) and supplemental

---

[21] *See, e.g., N. Am. Van Lines*, 487 F. Supp. 2d at 674 (taking supplemental jurisdiction over state law contract claim because that claim and the plaintiff's Lanham Act claims all "require[d] the court to interpret [an agreement]" granting trademark rights to the defendant).

jurisdiction over the related state law claims, removal was proper, and the Shenda Parties' motion to remand will be denied.

B. JoLida's Motion for Preliminary Injunction

1. Standard of Review

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). Because issuing a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act or refrain from acting in a certain way, "[t]he danger of a mistake in this setting is substantial." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693–94 (4th Cir. 1994).

To obtain a preliminary injunction, the movant must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors him; and (4) an injunction is in the public interest.[22]  The movant must show more than a "grave or serious question for litigation"; instead, he bears the "heavy burden" of making a "*clear showing* that [he] is *likely* to succeed at trial on the merits." *Real Truth*, 575 F.3d

---

[22] *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008); *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010).

at 347, 351.  Courts have declined to issue a preliminary

injunction when there are significant factual disputes.  *See,*

*e.g.*, *Allegra Network LLC v. Reeder*, No. 1:09-CV-912, 2009 WL

3734288, at *3 (E.D. Va. Nov. 4, 2009).

2. Likelihood of Success on the Merits

JoLida seeks a preliminary injunction on its counterclaim

for trademark infringement under the Lanham Act (Count I),

cybersquatting under the Anticybersquatting Consumer Protection

Act (Count II), and tortious interference with economic rela-

tions (Count IV).  *See* ECF No. 14 at 5, 7.

a. Trademark Infringement

JoLida moves to enjoin the Shenda Parties, Prylli, and

their agents from using the JoLida Trademark "in connection with

the sale, attempted sale, or advertising . . . of any products

or services."  ECF No. 14 at 30.

To demonstrate trademark infringement under the Lanham Act,

JoLida must demonstrate that (1) it owns a valid and protectable

trademark,[23] and (2) the Shenda Parties' use of a copy or color-

able imitation of that trademark is "likely to cause confusion."

15 U.S.C. 1114; *George & Co. v. Imagination Entm't Ltd.*, 575

F.3d 383, 393 (4th Cir. 2009).

---

[23] "Fanciful" trademarks, which are "nonsense words expressly
coined for serving as a trademark," are protected.  *Retail
Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 539 (4th Cir.
2004).  There is no dispute that the JoLida Trademark is fanci-
ful.  *See* ECF No. 14 at 18.

Registration of a trademark is *prima facie* evidence that the registrant owns the trademark, and it is valid. *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002). Because registration grants a presumption of ownership in the trademark, the party challenging the registrant's ownership "must overcome this presumption by a preponderance of the evidence." *George & Co.*, 575 F.3d at 400 n.15 (*citing Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 775-76 (9th Cir. 1981)).

The parties dispute whether Shenda or JoLida owns the JoLida Trademark. ECF No. 14 at 11; ECF No. 20 at 12. JoLida asserts that because it registered the JoLida Trademark, it presumptively owns the trademark. ECF No. 14 at 11. It argues that the alleged 1997 Agreement assigning the JoLida Trademark to Shenda is a fake because: JoLida has no record of that document; JoLida's stockholders have never considered transfer-ring JoLida's ownership of the trademark; Hong-Sheng was never authorized to make such a transfer; JoLida has never had equip-ment capable of printing Chinese characters; and JoLida's let-terhead has not included a telex number since 1995. ECF No. 14 at 12; Allen Decl. ¶¶ 9, 11, 13, 15, 17. Further, after exam-ining a copy of the 1997 Agreement, JoLida's print media expert[24]

---

[24] Frank Romano, Professor Emeritus of Rochester Institute of Technology School of Print Media. Romano Aff. ¶ 2.

expressed "doubts as to [its] authenticity" because it appeared to be created from multiple documents.  Romano Aff. ¶¶ 10, 12. JoLida's forensic document examiner[25] also examined a copy of the 1997 Agreement, and opined that although it appeared to be "fabricated from other documents," the "original document must be produced and examined in order to prove conclusively [its] genuineness."  Morris Aff. ¶ 11-12.

JoLida also argues that even if the 1997 Agreement exists, it would be unenforceable because: JoLida did not receive consideration for assigning its trademark to Shenda; Hong-Sheng was never authorized to assign it; and discerning the intent of the agreement is impossible.  Allen Decl. ¶ 11; ECF No. 23 at 10.

Lastly, JoLida asserts that its right to the JoLida Trademark was confirmed by Shenda in the three legal documents signed by Loyal Qin--the Shenda Resolution, Declaration of Responsibility, and Certificate Confirmation.  ECF No. 23 at 8.

The Shenda Parties assert that the 1997 Agreement, which assigned ownership of the JoLida Trademark to Shenda and prohibited JoLida from registering it, is genuine.  ECF No. 20 at 12, 24.  They assert that JoLida is infringing on Shenda's JoLida Trademark.  *Id.* at 16.  The Shenda Parties argue that JoLida's actions show the legitimacy of the 1997 Agreement: Even though

---

[25] Ronald N. Morris, President of Ronald N. Morris & Associates, Inc.  Morris Aff. ¶ 2.

JoLida knew how to apply for a trademark with the USPTO--it abandoned its 1994 "S.G. JOLIDA" application--JoLida complied with the 1997 Agreement "by *refraining* (until 2005) from filing a trademark application" for the JoLida Trademark.  *Id.* at 8.

The Shenda Parties also assert that JoLida received consideration under the 1997 Agreement: JoLida assigned the JoLida Trademark under that agreement because it failed to make a capital contribution in Shenda as required by the alleged Joint Venture Agreement.  *See* Chen Decl. ¶¶ 3-4.  Finally, the Shenda Parties argue that the three legal documents upon which JoLida relies are illegitimate because Loyal Qin signed them without authorization "while he was secretly aiding and abetting JoLida."  ECF No. 20 at 11.

Although registration of the JoLida Trademark grants a presumption of ownership to JoLida, JoLida has not clearly shown that it is likely to win at trial.  *George & Co.*, 575 F.3d at 400 n.15; *Real Truth*, 575 F.3d at 347, 351.

The Shenda Parties have asserted the existence of a contract--the 1997 Agreement--that (1) granted ownership of the JoLida Trademark to Shenda and prohibited JoLida from registering it without permission,[26] and (2) was apparently performed by

---

[26] Compl., Ex. A at 2 (translation of 1997 Agreement providing that the "trademarks used by the audio products manufactured by Shenda belong to Shenda," and "[s]hould [JoLida] wish to register the [subject] trademark for the audio products in the U[nited]

JoLida until 2005.   Although JoLida has challenged the existence

and enforceability of the 1997 Agreement, it has not met its

"heavy burden" in justifying a preliminary injunction.   *Id.*   For

example, although JoLida's experts doubt the genuineness of the

1997 Agreement, neither examined the original document, which

diminishes the reliability of their opinions.[27]

Although JoLida asserts that the Shenda Parties have

offered no evidence of the Joint Venture Agreement, JoLida has

not denied the existence of the agreement.   *See* ECF No. 23 at 10

n.20.   The remaining issues--whether Hong-Sheng, who has died,

was authorized to enter into the alleged 1997 Agreement with

Chen; what they intended; what typewriter and letterhead Hong-

Sheng may have had access to; and whether Loyal Qin was autho-

rized to sign legal documents on behalf of Shenda--are signifi-

cant factual questions that are unable to be resolved on this

incomplete record.

---

S[tates] and other countries and areas, [JoLida] must obtain
authorization from Shenda").   The Shenda Parties have also
submitted a color copy of the 1997 Agreement.   ECF No. 48, Ex. 1.

[27] *Compare* Romano Aff. ¶¶ 4-5 (explaining that JoLida had provid-
ed him a "copy" of the 1997 Agreement), *and* Morris Aff. ¶ 12
(stating that "the original document must be produced and exam-
ined in order to prove conclusively the genuineness of [the 1997
Agreement]"), *with Ward v. Maloney*, No. 1:08CV54, 2008 WL 7346920,
at *6 (M.D.N.C. 2008) (rejecting plaintiff's reliance on expert
witnesses to establish whether a document was forged; one wit-
ness "admitted that he could not determine conclusively if the
document was a forgery because he had not seen the original," and
the other "similarly ha[d] never examined the original form").

In light of the alleged 1997 Agreement assigning ownership of the JoLida Trademark to Shenda, JoLida's apparent compliance with the agreement for eight years, and the remaining factual questions, JoLida has not clearly shown that it is likely to succeed on its trademark infringement claim.[28]   Accordingly, JoLida cannot obtain preliminary relief on its trademark infringement claim.[29]

    b. Cybersquatting

JoLida moves to enjoin the Shenda Parties, Prylli, and their agents to disable jolida.net and jolida.fr.   ECF No. 14 at 30.

Under the Anticybersquatting Consumer Protection Act ("ACPA"), a person is liable to the trademark owner if that person (1) registers or uses a domain name "identical or confus-ingly similar" to a distinctive trademark, and (2) has the "bad

---

[28] *See, e.g.*, *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (district court properly denied prelim-nary injunction because there were "doubtful and difficult" legal and factual questions about whether a trademark registrant had exclusive rights to the trademark); *Allegra*, 2009 WL 3734288, at *3 (plaintiff failed to show that he was likely to succeed on his breach of contract claim because there were "significant factual disputes . . . as to whether [the defendants] actually breached the franchise agreement," which the court "[could] not resolve"); *see also Wheelihan v. Bingham*, 345 F. Supp. 2d 550, 555 (M.D.N.C. 2004).

[29] Because JoLida has not clearly shown that it is likely to succeed on the merits regarding ownership of the JoLida Trade-mark, the Court need not consider whether the Shenda Parties' use of the trademark has created a likelihood of or actual confusion.  *See Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 255 n.3 (4th Cir. 2001).

faith intent to profit" from that trademark.  15 U.S.C. §
1125(d)(1)(A)(i)-(ii).  "[A] prerequisite for bringing a claim
under the [ACPA] is establishing the existence of a valid
trademark and ownership of that mark."  *Retail Servs.*, 364 F.3d
at 549-50 (trademark registrant had no ACPA claim because it did
not own a valid trademark).

JoLida asserts that: it owns the JoLida Trademark; the
Shenda Parties and Prylli use jolida.net and jolida.fr, which
are domain names identical or confusingly similar to the JoLida
Trademark and jolida.com; and the Shenda Parties acted with bad
faith to profit from the trademark.  ECF No. 14 at 23-24.

The Shenda Parties assert that they have the right to use
jolida.net and jolida.fr because Shenda owns JoLida Trademark.
ECF No. 20 at 26.  They also argue that they did not act in bad
faith, and registered the domains only after JoLida stopped
distributing Shenda's products.  *Id.*

The alleged 1997 Agreement, JoLida's apparent compliance
with it for several years, and the significant factual questions
that exist, may at trial be the bases for the successful rebut-
tal of JoLida's presumption of trademark ownership.  *See supra*
Part II.B.2.a.  Because only a trademark owner may bring an ACPA
claim, and JoLida has not clearly shown a likelihood of success
on its assertion of ownership of the JoLida Trademark, JoLida
cannot obtain preliminary relief on its cybersquatting claim.

c. Tortious Interference with Economic Relations

JoLida moves to enjoin the Shenda Parties, Prylli, and their agents from communicating or attempting to communicate with JoLida's distributors, dealers, and business partners.  ECF No. 14 at 31.

To demonstrate tortious interference with economic rela- tions under Maryland law, the plaintiff must show "(1) inten- tional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifi- able cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 652, 650 A.2d 260, 269 (1994).  This tort requires that the defendant's conduct be independently wrongful or unlawful, which includes defamation and the threat of groundless civil suits. *Id.* at 657, 650 A.2d at 271.  The plaintiff must demonstrate that the defendant "caused the destruction of the business relationship which was the target of the interference." *Med. Mut. Liab. Soc. of Md. v. B. Dixon Evander*, 339 Md. 41, 54, 660 A.2d 433, 439 (1995).

Tortious interference claims based on a defendant's efforts to enforce its intellectual property rights have been rejected. *See, e.g., U.S. Galvanizing & Plating Equip. Corp. v. Hanson-Van*

*Winkle-Munning Co.*, 104 F.2d 856, 862 (4th Cir. 1939).  An

intellectual property holder who believes that his claims are

valid may "warn purchasers from the alleged infringer so as to

caution the purchasers as to their own liability."  *Daesang*

*Corp. v. Rhee Bros., Inc.*, No. AMD-03-551, 2005 WL 1163142, at

*14 (D. Md. May 13, 2005).

   JoLida asserts that the Shenda Parties and Prylli have

intended to harm JoLida's economic relations because: jolida.net,

jolida.fr, and Prylli's e-mails to JoLida's distributors are

defamatory; Prylli told Underwood Hifi, a JoLida distributor,

that he would sue Underwood Hifi if it were Allen's "ally"; and

Prylli told Allen he was "confident" enough to contact JoLida's

resellers.[30]  Without elaboration, JoLida argues that its

goodwill is being harmed. ECF No. 14 at 28.

   The Shenda Parties argue that Shenda owns the JoLida Trade-

mark--which JoLida has infringed--and they have the right to tell

distributors that Shenda has designed and manufactured "the

quality products that the public has come to expect from the

JoLida brand." ECF No. 20 at 16, 34-35.  They also assert that

JoLida has not shown a loss of economic relationships. *Id.*

---

[30] *See* ECF No. 23 at 13-14; Countercl., Ex. 19 (Prylli's July 1,
2010 e-mail); *id.*, Ex. 20 (Prylli's Aug. 18, 2010 e-mail); Allen
Decl., Ex. 20 (Prylli's Aug. 28, 2010 e-mail).

JoLida has not identified defamatory statements in e-mails
or on jolida.net or jolida.fr.  Assuming that JoLida has been
injured, it has not clearly shown that it is likely to succeed
in demonstrating that Shenda acted maliciously and unjustifiably.
*See Alexander & Alexander*, 336 Md. at 652, 650 A.2d at 269.

Shenda believes that it owns the JoLida Trademark, and has
the right to defend its rights by informing JoLida distributors
that only Shenda designs genuine JoLida audio products.[31]  Also,
because Shenda has the right to warn JoLida's partners about
their potential liability for trademark infringement, Prylli's
warning to Underwood Hifi that it would be sued if allied with
Allen was not a groundless threat.[32]  Further, JoLida has not
asserted that any distributor, including Underwood Hifi, has
indicated that it intends to "dest[roy its] business relation-

---

[31] *See, e.g.*, *Galvanizing*, 104 F.2d at 862 (defendant's letters
to plaintiff's customers that the plaintiff had infringed on the
defendant's patent did not constitute bad faith or harassment;
the "defendant believed that its patents were being infringed
and gave notice accordingly"); *Spangler Candy Co. v. Crystal
Pure Candy Co.*, 235 F. Supp. 18, 31–33 (N.D. Ill. 1964) (trade-
mark owner who issued press releases that it had sued the defen-
dant for infringement and other illegal acts had not acted
improperly; it "ha[d] the right to defend [it]self against
infringement"); *see also Blue Cross & Blue Shield Ass'n v. Group
Hospitalization & Med. Servs., Inc.*, 744 F. Supp. 700, 718–19
(E.D. Va. 1990).

[32] *See Daesang*, 2005 WL 1163142, at *13–*14, *16 (trademark
registrant who sued the plaintiff's business partner for using
the trademark had not tortiously interfered with the plaintiff's
economic relations; although the trademark was invalid, the
registrant "believed, although mistakenly, that [its trademark]
was valid"); *see also Spangler Candy*, 235 F. Supp. at 33.

ship" with JoLida.  *B. Dixon Evander*, 339 Md. at 54, 660 A.2d at 439.  Thus, because JoLida has not clearly shown that it is likely to succeed on the merits on its tortious interference with economic relations claim, it cannot obtain preliminary relief on that claim.[33]

C. Prylli's Motion to Dismiss for Lack of Personal Jurisdiction

1. Standard of Review

The party asserting the claim bears the burden of proving personal jurisdiction.  *Carefirst*, 334 F.3d at 396.  He must make a *prima facie* showing of personal jurisdiction when the district court decides jurisdiction on the complaint and motion papers.  *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009).  The district court "take[s] all disputed facts and reasonable inferences in favor of the plain-tiff."  *Carefirst*, 334 F.3d at 396.  However, a court need not "credit conclusory allegations or draw farfetched inferences."  *Masselli & Lane, PC v. Miller & Schuh, PA*, No. 99-2440, 2000 WL 691100, at *1 (4th Cir. May 30, 2000).[34]

---

[33] Because JoLida has not clearly shown a likelihood of success on the merits, the remaining preliminary injunction factors need not be examined.  *See Kalos v. Greenwich Ins. Co.*, No. 10-1959, 2010 WL 5129880, at *1 (4th Cir. Dec. 14, 2010).

[34] Personal jurisdiction may be general or specific.  General jurisdiction requires the defendant's "continuous and system-atic" contacts with the forum state.  *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 450 (4th Cir. 2000).  Specific jurisdiction requires that the

A federal district court may assert specific personal jurisdiction over a non-resident when the exercise of jurisdiction is (1) authorized by the forum state's long-arm statute, *and* (2) consistent with due process.  *Carefirst*, 334 F.3d at 396.

2. The Parties' Arguments

In moving to dismiss for lack of personal jurisdiction, Prylli asserts that he has had no contacts with Maryland, and that it is more appropriate to litigate against him in China or France, where his alleged acts occurred.  ECF No. 34 at 5; Prylli Decl. ¶ 9.  Prylli is a citizen and resident of France, and has never been to Maryland or done business here.  *Id.* ¶¶ 1-4, 7. He has no telephone listing, mailing address, bank account, or property here.  *Id.* ¶¶ 5-6.

JoLida asserts that Prylli's Internet activity subjects him to this Court's jurisdiction.  ECF No. 37 at 2.

3. Maryland's Long-Arm Statute

Maryland's long-arm statute limits jurisdiction to claims "aris[ing] from any act enumerated [in the statute]."  Md. Code Ann., Cts. & Jud. Proc. § 6-103(a).  Thus, the plaintiff must show that the defendant's activity is covered by a statutory

---

defendant's "contacts relate to the cause of action and create a substantial connection with the forum state."  *Id.*  JoLida contends that there is specific jurisdiction over Prylli.  ECF No. 37 at 5.

provision authorizing jurisdiction.  *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001).

JoLida asserts that Prylli is subject to jurisdiction under: subsections 6-103(b)(1), (3), and (4) of the long-arm statute; and the conspiracy theory of personal jurisdiction recognized under that statute.  ECF No. 37 at 6.

> a. Section 6-103(b)(1)

JoLida argues that Prylli is subject to jurisdiction as one who "transacts any business" in Maryland.  Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1); *see* ECF No. 37 at 6.  A defendant "transacts business" in the state if his actions "culminate in purposeful activity" here.  *Bahn v. Chi. Motor Club Ins. Co.*, 98 Md. App. 559, 568, 634 A.2d 63, 67 (1993).  Purposeful activity includes significant commercial negotiations with a party in Maryland.  *See, e.g.*, *Jason Pharms., Inc. v. Jianas Bros. Packaging Co.*, 94 Md. App. 425, 433-35, 617 A.2d 1125, 1129-30 (1992); *Mohamed v. Michael*, 279 Md. 653, 659, 370 A.2d 551, 554 (1977).

JoLida contends that Prylli's e-mails to Allen in Maryland--which JoLida asserts were accompanied by telephone calls--about wanting to buy JoLida and establish a Maryland office constitute purposeful activity.  *See* ECF No. 37 at 6.  These communications merely expressed Shenda's desire to contract with Allen or

possibly buy a competing Maryland office.[35]   They do not rise to the level of significant commercial negotiations constituting purposeful activity in Maryland.[36]   Thus, Prylli's communications do not subject him to the Court's jurisdiction under § 6-103(b)(1).

b. Section 6-103(b)(3)

JoLida asserts that Prylli is subject to jurisdiction as one who "causes tortious injury in [Maryland] by an act or omission in [Maryland]."   Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(3); *see* ECF No. 37 at 6.   The tortious act of trademark infringement occurs in, among other places, the "place where customers are likely to be deceived and confused."   *Music Makers Holdings, LLC v. Sarro*, No. RWT 09-CV-1836, 2010 WL 2807805, at *4 (D. Md. July 15, 2010).

JoLida asserts that "Prylli has engaged in acts of trade-mark infringement [by maintaining jolida.net] that are especially confusing to Maryland residents and customers given their famil-

---

[35] *See* ECF No. 37 at 6; ECF No. 37, Ex. 4 at 4 (Prylli's June 17, 2010 e-mail to Allen that Prylli could visit Annapolis to buy JoLida); Countercl., Ex. 21 at 1-2 (Prylli's June 30, 2010 e-mail giving Allen a deadline to sell JoLida); ECF No. 37 at 4, Ex. 4 at 13 (Prylli's Aug. 10, 2010 e-mail to Allen stating that Chen had been unable to buy a DC office and asking whether Allen would "mind if we [became] neighbo[rs] in Maryland").

[36] *See, e.g.*, *Jason Pharms.*, 94 Md. App. at 433-34, 617 A.2d at 1129-30 (Missouri corporation had engaged in purposeful activity under § 6-103(b)(1) by spending several weeks negotiating a $700,000 contract with a Maryland corporation in Maryland and sending a down payment into the state).

iarity with JoLida, a Maryland corporation."  ECF No. 37 at 7.

Assuming that JoLida has been injured in Maryland, it has not shown that the tortious act of trademark infringement took place in Maryland--that is, JoLida has not shown that customers are likely to be confused here.  In fact, jolida.net's homepage states: "Jolida.net does not have connections with [the] Maryland JoLida[,] Inc."[37]  JoLida has not shown that Maryland retail customers are familiar with JoLida; although JoLida is incorporated in Maryland, it sells products to distributors and dealers.  *See* Countercl. ¶ 15.  There is no indication that JoLida has any distributors or dealers here.[38]  Because JoLida has not shown that Maryland customers are likely to be confused by Prylli's alleged trademark infringement, there is no juris-diction over Prylli under § 6-103(b)(3).

c. Section 6-103(b)(4)

JoLida also argues that Prylli is subject to jurisdiction as one who "causes tortious injury in [Maryland] . . . by an act

---

[37] *See, e.g.*, *Music Makers*, 2010 WL 2807805, at *6 (New Yorker alleged to have infringed on Maryland corporation's trademark was not subject to personal jurisdiction in Maryland because, *inter alia*, she explained to confused Maryland customers that her company was in New York, not Maryland (*citing* § 6-103(b)(3))). JoLida has not asserted that Maryland residents are likely to be confused by jolida.fr, which is in French.

[38] *See, e.g.*, Countercl., Ex. 2 (advertisements of JoLida prod-ucts by dealers located in, among other places, Illinois, Maine, and Texas).

or omission outside [Maryland] if he . . . engages in [a] persistent course of conduct in [Maryland]." Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4); *see* ECF No. 37 at 6-7. To establish a "persistent course of conduct," the plaintiff must show that the defendant had "greater contacts than those necessary to establish jurisdiction under [§ 6-103](b)(1)." *Am. Ass'n of Blood Banks v. Bos. Paternity*, No. DKC-2008-2046, 2009 WL 2366175, at *6 (D. Md. 2009); *see also Dring v. Sullivan*, 423 F. Supp. 2d 540, 546-47 (D. Md. 2006).

JoLida asserts that Prylli has "purposefully undertaken to destroy [JoLida] in Maryland," and has called and e-mailed Allen in Maryland about buying JoLida. ECF No. 37 at 7.

Assuming that Prylli intended to harm JoLida in Maryland, JoLida must establish that Prylli engaged in a "persistent course of conduct." *See Ottenheimer*, 158 F. Supp. 2d at 652 (plaintiff must show that the "defendant's activities are covered by the [long-arm statute's] language").[39] As explained above, Prylli's calls and e-mails to Allen in Maryland expressing the desire to buy JoLida and possibly open a Maryland office were not significant commercial negotiations constituting purposeful activity. *See supra* Part II.C.3.a. Because those communications failed to confer jurisdiction under subsection

---

[39] JoLida's arguments about its injury in Maryland will be discussed in Part II.C.4.

(b)(1), they cannot establish a "persistent course of conduct in [Maryland]" under subsection (b)(4). *See Am. Ass'n of Blood Banks v. Bos. Paternity*, 2009 WL 2366175, at *6. Thus, § 6-103(b)(4) does not confer personal jurisdiction over Prylli.

d. Conspiracy Theory of Personal Jurisdiction

Jolida asserts that the Court may exercise jurisdiction over Prylli by applying the conspiracy theory recognized by Maryland's long-arm statute. ECF No. 37 at 7-8; *see Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 129, 892 A.2d 479, 486 (2009). Based on this theory, personal jurisdiction over a non-resident is proper when: "(1) two or more individuals conspire to do something (2) that they could reasonably expect to lead to consequences in a particular forum, if (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state[.]" *Id.*

Before the plaintiff may invoke the conspiracy theory of personal jurisdiction, he must make a *prima facie* claim of conspiracy. *See Mackey*, 391 Md. at 128-29, 892 A.2d at 485. A Maryland civil conspiracy claim must allege: an unlawful agreement entered into by two or more persons, an overt act in furtherance of that agreement, and injury to the plaintiff. *Id.*

JoLida's civil conspiracy claim alleges: (1) Prylli, Shenda, Chattery, and Chen "conspired together for the purpose of harming JoLida as described [in the counterclaim] and have in fact harmed JoLida"; (2) they entered into an agreement "in or about 2008 . . . whereby Prylli and/or other agents, with the financial and other assistance of Chen, Shenda, and Chattery, would commit some or all of the unlawful acts described [in the counterclaim]"; (3) the "co-conspirators acted in furtherance of the conspiracy by offering financial assistance and logistical support for the[ir] comprehensive coordinated actions"; (4) "Prylli, Chen, and/or individuals, agents, and entities under their direction and control have committed tortious act[s] in furtherance of the conspiracy as alleged above"; and (5) "[t]herefore, all co-conspirators are jointly liable . . . for the tortious acts[.]"  Countercl. ¶¶ 130–34.

As the Shenda Parties note, JoLida has not made a *prima facie* conspiracy claim.  *See* ECF No. 39 at 15–16.  JoLida has provided no facts to support its allegations that Prylli and the Shenda Parties entered into a 2008 agreement to tortiously injure JoLida.[40]  Further, the Court is unable to infer a

---

[40] *See, e.g.*, *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764–65 (4th Cir. 2003) (a plaintiff must allege facts that support each element of the claim advanced to state a claim); *AP Links, LLC v. Global Golf, Inc.*, No. CCB-08-705, 2008 WL 4225764, at *4 (D. Md. Sept. 2, 2008) (because the plaintiff had not provided factual allegations establishing a "conspiratorial

conspiracy from the remainder of the counterclaim because there is no description of any agreement or "meeting of the minds" to harm JoLida.[41]  JoLida's "conclusory allegations" of a conspiracy are insufficient to invoke the conspiracy theory of personal jurisdiction.  *See Masselli & Lane,* 2000 WL 691100, at *1.

Accordingly, the Court cannot exercise jurisdiction over Prylli under Maryland's long-arm statute or the conspiracy theory.

4. Prylli's Due Process Rights

Had Prylli been subject to jurisdiction under Maryland's long-arm statute, exercising jurisdiction over him would be inconsistent with due process.

In determining whether the exercise of specific personal jurisdiction comports with due process, a court traditionally considers, *inter alia*, "the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state." *Carefirst*, 334 F.3d at 397.  Under the "effects" test, a court may also assert jurisdiction over a

_____

meeting of the minds" among the defendants, he could not invoke Maryland's conspiracy theory of personal jurisdiction).

[41] *See, e.g., AGV Sports Group, Inc. v. Protus IP Solutions, Inc.*, No. RDB 08-3388, 2009 WL 1921152, at *5-*6 (D. Md. July 1, 2009) (plaintiff who failed to "amplify [its] other allegations by demonstrating [the defendants'] connection to [a] purported conspiracy" could not invoke Maryland's conspiracy theory of personal jurisdiction).

non-resident defendant who has "expressly aimed" his tortious
conduct at the forum state, knowing that the injury would be
felt there. *Calder v. Jones*, 465 U.S. 783, 789 (1984).

The Fourth Circuit has interpreted the "effects" test
narrowly. *See Young v. New Haven Advocate*, 315 F.3d 256, 263
(4th Cir. 2002); *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d
617, 626 (4th Cir. 1997). Ultimately, asserting jurisdiction
over an out-of-state defendant is appropriate depending on "the
defendant's own contacts with the state," not where the plain-
tiff feels the alleged injury. *ESAB Group,* 126 F.3d at 626
(*citing Calder*, 465 U.S. at 789). Otherwise, jurisdiction would
always "[be] appropriate in a plaintiff's home state, for the
plaintiff *always* feels the impact of the harm there." *Id.*

The Fourth Circuit has adapted *Calder*'s "effects" test to
online activity: in the Internet context, specific jurisdiction
"may be based only on an out-of-state person's Internet activity
directed at Maryland and causing injury that gives rise to a
potential claim cognizable in Maryland." *See ALS Scan, Inc. v.
Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir.
2002) (*citing Calder*, 465 U.S. at 789-90).

When the Internet activity involves posting information on
a website, the question is whether the defendant "manifested an
intent to direct [his] website content [to the forum state's]
audience." *See Young v. New Haven Advocate*, 315 F.3d 256, 263

(4th Cir. 2002) (*citing ALS*, 293 F.3d at 712); *Carefirst*, 334 F.3d at 400.   Thus, a website that allegedly infringes on intellectual property does not automatically establish jurisdiction over the website's owner, particularly if there are only isolated or no sales to residents of the forum state.   *See, e.g.*, *Am. Ass'n of Blood Banks*, 2009 WL 2366175, at *9.

JoLida asserts that Prylli has engaged in "tortious acts explicitly aimed at JoLida" while knowing it would be harmed in Maryland, its only place of business.   ECF No. 37 at 9.   It asserts that jolida.net and jolida.fr--owned by Prylli--infringe on the JoLida Trademark and falsely accuse JoLida and Allen of dishonesty.   *Id.* at 3.   It also argues that Prylli has "tortiously intimidate[d JoLida's] distributors" through Prylli's e-mails to them.   *Id.* at 11.

Prylli asserts that his Internet activities were not directed toward Maryland.   ECF No. 39 at 8.

JoLida has not shown that jolida.net or jolida.fr was intended to target a Maryland audience.   That these allegedly infringing websites can be accessed by anyone--including Maryland residents--does not confer personal jurisdiction over Prylli, the websites' owner.[42]   Before buying a product from

---

[42] *See, e.g.*, *Carefirst*, 334 F.3d at 399, 400-01 (Illinois organization whose website allegedly infringed on a Maryland company's trademark was not subject to jurisdiction in Maryland; the website, which was accessible from anywhere and solicited

jolida.net, customers are directed to select shipping from the United States, Canada, or another country.[43]   Jolida.fr, which is in French, tells customers which retailers in France sell Shenda's products.   JoLida has not asserted that a Maryland customer has visited either website.[44]

Further, although JoLida argues that it is being injured in Maryland by Prylli's allegedly false statements via his e-mails and websites, ECF No. 37 at 9, jurisdiction cannot be asserted over Prylli absent Internet activity "directed at Maryland." *ALS*, 293 F.3d at 714.[45]   There is no indication that Prylli has

---

donations from all visitors, did not target Maryland residents (*citing Calder*, 465 U.S. at 789)).

[43] *See ESAB Group*, 126 F.3d at 625 (South Carolina had no juris-diction over a New Hampshire manufacturing company that "focused its activities more generally on customers located throughout the United States and Canada without focusing on and targeting South Carolina" (*citing Calder*, 465 U.S. at 789–90)).

[44] *Am. Ass'n of Blood Banks*, 2009 WL 2366175, at *9 (Maryland had no jurisdiction over New Hampshire defendants who maintained a website infringing on the plaintiff's trademarks; there was "no indication that [the defendants] ever entered into a transaction with a Maryland resident" or that the defendants "direct[ed] its website into Maryland with the manifest intent of engaging in any transaction within the state"); *see also Shamsuddin v. Vitamin Research Prods.*, 346 F. Supp. 2d 804, 813–14 (D. Md. 2004).

[45] *See, e.g., Young*, 315 F.3d at 263–64 (Virginia had no juris-diction over Connecticut newspapers that posted Internet arti-cles defaming a Virginia prison warden; although the newspapers knew that the warden worked and lived in Virginia and that he would primarily feel any harm there, "[t]he newspapers did not post materials on the Internet with the manifest intent of tar-geting Virginia readers" (*citing Calder*, 465 U.S. at 790)); *see*

ever e-mailed a JoLida Maryland distributor, or that JoLida has
any Maryland distributors.  JoLida has felt the alleged harm
from Prylli's activities in Maryland only because its sole place
of business is here, and that is insufficient for jurisdiction;
personal jurisdiction does not "depend on a *plaintiff's* decision
about where to establish residence."  *ESAB Group*, 126 F.3d at
626.

Thus, had Maryland's long-arm statute authorized juris-
diction over Prylli, exercising jurisdiction over him would be
inconsistent with due process because Prylli did not direct his
Internet activity at Maryland.  *ALS*, 293 F.3d at 714.[46]

Because JoLida has failed to make a *prima facie* showing of
personal jurisdiction over Prylli, his motion to dismiss for
lack of personal jurisdiction must be granted.

---

also *Carefirst*, 334 F.3d at 401; *ESAB Group*, 126 F.3d at 626;
*Dring*, F. Supp. 2d at 547–49.

[46] JoLida has moved to file a surreply to its opposition to
Prylli's motion to dismiss.  ECF No. 46.  The proposed surreply
asserts that: on December 30, 2010, Prylli e-mailed one of
Shenda's former Illinois customers, stating that Shenda owns the
JoLida Trademark and that JoLida is dishonest.  ECF No. 46, Ex.
1.  JoLida asserts that Prylli's e-mail further demonstrates that
he has "directed his unlawful actions toward the United States
in general with an expressed intent to harm JoLida where it is
located within this District."  ECF No. 46 at 2–3.  As stated
above, jurisdiction over Prylli depends not on where JoLida was
harmed, but whether Prylli directed his Internet activity at
Maryland.  *ALS*, 293 F.3d at 714.  JoLida concedes that Prylli's
e-mail was to an *Illinois* resident.  ECF No. 46 at 3. JoLida's
motion to file a surreply will be denied as moot.

III. Conclusion

For the reasons stated above, the Shenda Parties' motion to remand and JoLida's motion for preliminary injunction will be denied, and Prylli's motion to dismiss for lack of personal jurisdiction will be granted.

March 23, 2011                          _____/s/_____
Date                                    William D. Quarles, Jr.
                                        United States District Judge